**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**SHARON ROCHELLE BIRKLEY,**

**Plaintiff,**

**v.** **Case No. 25-CV-793**

**TARGET CORPORATION,**

**Defendant.**

---

## DECISION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Sharon Rochelle Birkley, appearing *pro se*, sues her former employer, Target Corporation, alleging she was terminated from her employment due to her race and sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"). Birkley further alleges that Target retaliated against her for engaging in statutorily protected activity, in violation of Title VII. Target has moved for summary judgment dismissing Birkley's complaint. For the reasons explained below, Target's motion is granted and the complaint is dismissed.

## INITIAL MATTERS

If a party is proceeding *pro se*, as Birkley is, and the opposing party files a motion for summary judgment, the movant must provide the *pro se* party a copy of Fed. R. Civ. P. 56 and Civil L. R. 7, as well as include a statement alerting the *pro se* party that any factual assertion in the movant's documentary evidence will be accepted by the Court as being true if the *pro se* party fails to present her own contradicting admissible documentary evidence.

Target properly complied with Civil L. R. 56(a) in its motion for summary judgment. (Docket # 69.)

Despite receiving this warning, Birkley has failed to file "a concise response to the moving party's statement of facts," as required by Civil L. R. 56(b)(2)(B). Rather, her response to Target's statement of facts consists of 207 pages of argument as to each proposed factual finding. (Docket # 80; Docket # 81.) Birkley also appends multiple unauthenticated exhibits to her response. (Docket # 83.) This evidence, however, cannot be considered on summary judgment. As the Seventh Circuit has instructed:

> It bears repeating that the purpose of summary judgment is to determine whether there is any genuine issue of material fact in dispute and, if not, to render judgment in accordance with the law as applied to the established facts. The facts must be established through one of the vehicles designed to ensure reliability and veracity—depositions, answers to interrogatories, admissions and affidavits. When a party seeks to offer evidence through other exhibits, they must be identified by affidavit or otherwise made admissible in evidence.

*Martz v. Union Labor Life Ins. Co.*, 757 F.2d 135, 138 (7th Cir. 1985). Although Birkley appears *pro se*, this does not excuse her from presenting admissible evidence to oppose Target's summary judgment motion. Because Birkley failed to respond to Target's statement of facts consistent with the local rules, I will consider all of the defendant's proposed findings of fact to be uncontested for purposes of the motion. Civil L.R. 56(b)(4). *See Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("A district court is not required to wade through improper denials and legal argument in search of a genuinely disputed fact. And a mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material.") (internal quotations and citations omitted).

## UNDISPUTED FACTS

On October 5, 2021, Birkley, a Black female, was hired as a Warehouse Worker at Target's Distribution Center in Oconomowoc, Wisconsin. (Def.'s Statement of Proposed Findings of Fact ("DPFOF") ¶ 32, Docket # 70; Pl.'s Resp. to DPFOF at 1, Docket # 80.) In this role, Birkley reported to various managers, including Jasmine Vernon, Jazet Ayala Tejada, Andrew Daane, and Shaun Wiebe. (DPFOF ¶ 33.) Warehouse workers are trained to perform "functions" within the distribution center including non-con, lanes, and flex lanes. (*Id.* ¶¶ 34–35.) In the lanes function, team members are responsible for loading delivery trucks with merchandise from a certain set of lanes (like a conveyer belt). (*Id.* ¶ 36.) In the non-con function, team members use powered industrial equipment to pick up pallets of merchandise and deliver them to trailers. (*Id.* ¶ 37.) Birkley was trained in flex lanes, non-con, and two other functions, "depal" and "RSS." (*Id.* ¶ 38.)

Between December 5, 2021, and January 22, 2021, Birkely was coached six times for employment issues such as speaking disrespectfully to fellow team members. (*Id.* ¶¶ 46–48.) On January 16, 2022, operations manager Daane observed Birkley away from her assigned work area speaking with another team member. (DPFF ¶ 49.) Daane reviewed Birkley's production data, which indicated that Birkley was performing below expected levels. (*Id.* ¶ 50.) During the coaching conversation, Daane perceived Birkley as talking over him, deflecting responsibility, and asserting that he did not have the right to question her actions. (*Id.* ¶ 52.) When Daane articulated his expectations for Birkley for the rest of the shift, he perceived Birkley as walking away without acknowledging the feedback. (*Id.* ¶ 53.) Thus, on January 22, 2022, Daane issued Birkley a Corrective Action for unacceptable conduct for failing to behave in a respectful manner because Birkley interrupted and talked over Daane,

did not listen to feedback, and walked away from the coaching conversation before it was complete. (*Id.* ¶ 54.)

On January 26, 2022, Birkley called Target's Hotline to report six issues she was having with her coworkers and managers. (*Id.* ¶ 65.) Birkley did not, however, allege that her issues were related to her race, sex, or other protected characteristic. (*Id.* ¶ 66.) On February 2, 2022, Birkley called Target's Hotline and alleged Tejada was creating a hostile work environment with his style of management but did not allege that the hostile work environment was because of her race, sex, or other protected characteristic. (*Id.* ¶ 67.) On June 20, 2022, Birkley called Target's Hotline and complained she had only been trained in two functions but did not allege that Target's failure to train her was because of her race, sex, or other protected characteristic. (*Id.* ¶ 68.) On August 4, 2022, Birkley called Target's Hotline and alleged Daane was rude and unprofessional and did not show strong leadership; Birkley also complained about the January Corrective Action. (*Id.* ¶ 69.)

On August 14, 2022, Birkley alleged favoritism/discrimination based on race and sex to Alexis Behnke, Target's Human Resources Business Partner. (*Id.* ¶ 79.) The next day, Birkely called Target's Hotline to complain that Tejada was targeting her and finding things to discipline her for. (*Id.* ¶ 80.) Birkley did not, however, allege that this was because of her race, sex, or other protected characteristics. (*Id.*)

Between January 22, 2022 and August 20, 2022, Target's records reflect that Target coached Birkley twenty-nine times in the categories of safety, teamwork, quality, and reliability. (*Id.* ¶ 71.) Specifically, Target coached Birkley for leaving early; taking unapproved breaks; being out of position; and not following Target's safety policies, including bending at the waist, not utilizing team lifts when required, not using a step stool,

not maintaining four-feet of distance between her and other team members while driving powered equipment/powered industrial trucks ("PIT"), failing to stop at a stop sign while operating PIT equipment, and pinch/claw gripping while lifting cartons. (*Id.* ¶ 72.)

On August 20, 2022, Tejada issued Birkley a Second Corrective Action for unacceptable performance for failing to meet safety and teamwork expectations. (*Id.* ¶ 73.) The Corrective Action stated: "We have had multiple conversations, most recently on 8/13, regarding the importance of following safe ergonomic lifting expectation, specifically bending at the knees while lifting and handling freight as well as 8/6 regarding the importance of following teamwork expectations. However, you continue to trend negatively. This negatively [a]ffects our team production, safety, and moral[e]." (*Id.* ¶ 76.)

On August 30, 2022, Birkley called Target's Hotline to complain that Daane claimed he was assigning her a light load but put her in a position to overwork herself doing the work of two people. (*Id.* ¶ 81.) She further alleged that other team members received easier work and did not have the same delays in training. (*Id.*) The same day, Birkley separately reported to Target's Hotline that Senior Operations Manager Mandy Langlois recorded a meeting between them, which seemed like an unfair tactic to be used for future retaliation and was disrespectful. (*Id.* ¶ 82.) Again, she did not allege anything about race, sex, or any other protected characteristic. (*Id.*) Birkley made the same report to Target's Hotline on September 1, 2022. (*Id.* ¶ 83.)

On September 5 and 6, 2022, Birkley told Behnke she had filed or was going to file an Equal Employment Opportunity Commission ("EEOC") claim regarding race and sex discrimination and retaliation. (*Id.* ¶ 87.) On October 14, 2022, Birkley reported to Target's Hotline that Tejada falsely accused her of bending at the waist and singled her out. (*Id.*

¶ 88.) The same day, Birkley reported to Target's Hotline that a coworker pointed a handheld scanner at her and pulled the trigger on the scanner as if it was a gun. (*Id.* ¶ 89.) On November 21, 2022, Vernon coached Birkley for speaking loudly to Tejada. (*Id.* ¶ 90.)

Between August 20, 2022, and November 27, 2022, Target's records reflect Birkley was coached eight times in the categories of safety, teamwork, and reliability. (*Id.* ¶ 77.) Target coached Birkley for arriving late, being out of position, bending at the waist, inappropriately coaching other team members, and driving PIT equipment against traffic. (*Id.* ¶ 78.)

On November 21, 2022, Birkley met with Behnke to raise concerns that other team members were not coached on proper lifting practices. (*Id.* ¶ 91.) During this meeting, Birkley admitted that she had been using her phone while performing her work duties, including to take pictures and to record other team members. (*Id.* ¶¶ 92–96.) On November 25, 2022, Birkley reported to Target's Hotline that Tejada sexually harassed her because he had a pen in his mouth and flicked his eyebrows up and down in a flirtatious manner. (*Id.* ¶ 97.) On November 27, 2022, Target issued Birkley a third Corrective Action for unacceptable conduct for admitting to impermissibly using her phone to record other team members on the warehouse floor, impacting the safety of herself and others. (*Id.* ¶ 99.) Birkley believes this Corrective Action was based on her race, sex, or retaliation because she believes Behnke and Vernon knew she recorded during work and chose to write her up for it suddenly. (*Id.* ¶ 100.)

On December 10, 2022, Vernon coached Birkley on teamwork and safety. (*Id.* ¶ 101.) On December 12, 2022, Vernon coached Birkley on teamwork after another team member complained Birkley was invading her privacy and constantly approaching her as if she was

the team member's manager. (*Id.* ¶ 102.) On December 13, 2022, Birkley reported to Target's Hotline that Vernon and Langlois violated a safety procedure by not using personal protective equipment when extracting a suspicious item from a garbage can. (*Id.* ¶ 103.) That same day, Birkley reported to Target's Hotline that Vernon was being unfair because she would not train Birkley on RC equipment and did not rotate team members between tasks. (*Id.* ¶ 104.) On December 18, 2022, Vernon coached Birkley on teamwork because Vernon believed Birkley was looking at confidential information on Vernon's computer screen. (*Id.* ¶ 105.) When Vernon told Birkley her screen was confidential, Birkley raised her voice and spoke in an unprofessional tone. (*Id.* ¶ 106.) On December 18, 2022, Birkley reported to Target's Hotline that Vernon pushed back from a table aggressively and clapped her hands together. (*Id.* ¶ 107.)

On December 19, 2022, Vernon and Tejada requested permission to terminate Birkley's employment. (*Id.* ¶ 108.) At 1:55pm on December 19, 2022, Behnke confirmed approval to terminate because Birkley had three Corrective Actions in a rolling 12-month period and continued to display a negative performance trend, warranting further corrective action. (*Id.* ¶¶ 109–10.) On December 20, 2022, Behnke called Birkley and terminated her employment. (*Id.* ¶ 111.)

Utilizing Target's Termination Appeal Procedures, Birkley disputed her termination. (*Id.* ¶ 112.) Birkley alleged she was wrongly terminated due to the hatred of her management and that discrimination caused a hostile work environment in which she was gaslit and manipulated. (*Id.* ¶ 113.) A neutral investigator investigated Birkley's appeal and did not substantiate any misconduct or policy violation. (*Id.* ¶ 114.) On February 10, 2023, Birkley filed a Charge with the EEOC, alleging that she experienced sex discrimination,

race discrimination, and retaliation. (*Id.* ¶ 115.) The EEOC dismissed Birkley's Charge on March 13, 2025. (*Id.* ¶ 116.)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Birkley asserts that she was terminated from her employment in December 2022 due to her race and sex. She further alleges that Target retaliated against her for engaging in a statutorily protected activity. I will address each in turn.

*1. Title VII Discrimination*

Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To defeat summary judgment on her discrimination claim, Birkley needs to submit evidence from which a reasonable juror could conclude that Target terminated her employment because of her race and/or sex. *Ortiz v. Werner Enter. Inc.*, 834 F.3d 760, 764 (7th Cir. 2016). The evidence "must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Id.* While *Ortiz* disposes of the distinction between "direct" and "indirect" evidence, it does not affect the *McDonnell Douglas* burden shifting framework. *Id.* at 766; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under *McDonnell Douglas*, Birkley has the initial burden of establishing that (1) she is a member of a protected class, (2) she performed reasonably on the job in accord with her employer's legitimate expectations, (3) despite her reasonable performance, she was subjected to an adverse employment action, and (4) similarly situated employees outside of her protected class were treated more favorably by the employer. *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017). If Birkley satisfies that burden, then the employer must articulate a legitimate, nondiscriminatory reason for the adverse

employment action, at which point the burden shifts back to Birkley to submit evidence that the employer's explanation is pretextual. *Id.*

Target argues that Birkley fails to satisfy both the second and fourth elements of the *McDonnell Douglas* burden-shifting analysis. (Docket # 71 at 4.) As an initial matter, when an employer argues that its employee was not meeting the employer's legitimate work expectations, the inquiry often overlaps with the question of pretext. *Brooks v. Avancez*, 39 F.4th 424, 435 (7th Cir. 2022). As such, where "legitimate expectations and pretext overlap," the court "can be more efficient by addressing both together rather than first determining whether there is a prima facie case of discrimination and then turning to pretext." *Id.* The court of appeals has stated that this procedure is, "in fact . . . more in keeping with the 'whole evidence' outlook espoused by [the] court in *Ortiz*." *Id.* Thus, if an employer "offers a non-discriminatory reason for the termination and we determine the reason is not pretextual, we can skip the remaining analysis of the prima facie case." *Id.*

In this case, the question of pretext and employer expectations indeed overlap. Target asserts that, during Birkley's 14-and-a-half month tenure as a warehouse worker, she was coached 46 times for issues related to teamwork, reliability, safety, and job performance and received three Corrective Actions. (Declaration of Sara Lewenstein ("Lewenstein Decl.") ¶ 10, Ex. H, Docket # 75-8.) By way of example, during her first two months of employment, Birkley was coached twice for engaging in "unacceptable behavior with other team members" by yelling at them and speaking to them disrespectfully. (*Id.* at 3, 5.) Despite these coachings, Target recorded several additional incidents in which Birkley was coached for speaking inappropriately to management (*id.* at 19, 29) and she continued to have conflicts with her colleagues, resulting in further coaching (*id.* at 25, 27, 29, 31).

Target recorded that Birkley took an unscheduled break on January 17, 2022; left work early without permission on February 12, 2022, February 13, 2022, and February 14, 2022; arrived late on August 29, 2022; and was not at her assigned position on January 17, 2022, April 16, 2022, April 30, 2022, and May 22, 2022. (*Id.* at 7–8, 13, 25.) Target also coached Birkley regarding job performance issues on multiple occasions, including March 28, 2022, June 11, 2022, August 21, 2022, and September 10, 2022. (*Id.* at 11, 15, 23, 25.) Birkley was also coached nearly two dozen times for violating Target's safety protocols, such as by not lifting ergonomically, not using a teamlift when required, and "encroaching on the 4 ft 'halo' for PIT equipment." (*Id.* at 5, 9, 11, 13, 15, 17, 19, 21, 23, 25, 29.)

Behnke avers that Birkley was terminated because she had three Corrective Actions in a rolling 12-month period and continued to display a negative performance trend which warranted further corrective action. (Declaration of Alexis Behnke ¶ 23, Docket # 72.) While Birkley disputes *why* these records were created, she does not dispute that "corrective actions were issued" and "coaching occurred." (Docket # 79 at 4–5.) As such, Target has articulated a non-discriminatory reason for terminating Birkley's employment.

The question, then, is whether Target's stated reason was pretextual. "Pretext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action." *Smith v. Chicago Transit Auth.*, 806 F.3d 900, 905 (7th Cir. 2015) (internal citation omitted). A plaintiff "must demonstrate pretext by a preponderance of the evidence." *Brooks*, 39 F.4th at 435. "If the employer honestly believed its reasons for taking the challenged actions, even if those reasons were incorrect, then the reasons were not pretextual." *See v. Illinois Gaming Bd.*, 29 F.4th 363, 368 (7th Cir. 2022). In determining whether the employer's reason can be characterized as pretextual, the court does "not

evaluate whether the employer's proffered justification was accurate or even whether it was unfair." *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020). Rather, the "sole focus" is on "whether the employer's stated reason can be characterized as a falsehood rather than an honestly held belief." *Id.* And because "courts are not super-personnel departments who sit in judgment of management decisions" it does not matter if the employer's reasoning is "incorrect, trivial or even baseless"— the only question is "whether the employer honestly believed it had a non-discriminatory reason for termination." *Brooks*, 39 F.4th at 436 (internal quotation and citation omitted).

Birkley does not dispute that Target's employee handbook contains safety expectations for all team members, prohibits the use of cell phones on the warehouse floor, and requires all employees to be in position and on task during their shift. (DPFOF ¶¶ 7–14 and Pl.'s Resp. ¶¶ 7–14.) Birkley agrees that she received a copy of the employee handbook and that all employees are expected to follow Target's policies. (*Id.* ¶¶ 12–13.) She argues, however, as evidence of pretext, that Target selectively enforced its policies against her but not others. (*Id.*) She asserts that her colleagues made "false complaints" against her and Target "relied upon false accusations, unsupported complaints, incomplete investigations, and management's version of events while disregarding Plaintiff's observations, experiences, reports, recordings, photographs, and other supporting evidence." (*Id.* ¶¶ 46–49, 73.) She further argues that Target failed to discipline other employees who engaged in similar or more serious safety violations than her. (*Id.* ¶¶ 7–8.)

"When a plaintiff claims that she was disciplined and a similarly situated employee was not, the plaintiff must show not only that the two employees engaged in similar conduct (including considerations of differentiating or mitigating circumstances), but also that the

conduct was material to the adverse employment action." *Brooks*, 39 F.4dth at 437. Birkley repeatedly asserts that Target selectively enforced its policies against her while failing to enforce it against similarly situated employees and leadership. (*See, e.g.,* Docket # 80; Docket # 81.) Despite these assertions, Birkley fails to put forth any admissible evidence of such similarly situated individuals. Birkley acknowledges that she lacks documentary evidence of comparators but blames the lack of evidence on Target's failure to disclose records in discovery. (Docket # 80 at 32.) Birkley asserts, however, that her evidence consists of her own personal knowledge, namely, each time she was disciplined, she informed management of other employees engaged in the same or more serious conduct. (Docket # 81 at 1.) She then asked those employees whether they had received coaching or Corrective Actions, and those employees informed Birkley they had not. (*Id.*)

As to Birkley's assertions Target withheld discovery, Birkley filed a motion to compel discovery on December 29, 2025 (Docket # 50) and a hearing was held on Birkely's motion on January 7, 2026 (Docket # 55). Birkley filed a second motion to compel on January 14, 2026 (Docket # 57) and Birkley's motion was denied by written order on January 23, 2026 (Docket # 61). At that time, Birkley was ordered to meet and confer with Target if she believed Target's discovery responses remained deficient and to alert the Court if the dispute could not be resolved after a good faith attempt to do so. (*Id.* at 3–4.) Birkley did not do so. And as to those employees she asserts that she informed Target about, she presents no details to show they are indeed similarly situated. Beyond generally stating that "non-Black, male employees" who engaged in dangerous operating maneuvers were not targeted (Docket # 79 at 6), it is otherwise unclear these individuals' position with the

company or the facts surrounding those individuals' alleged incidents, including differentiating or mitigating circumstances. This is insufficient evidence of pretext.

For these same reasons, Birkley's *prima facie* case fails on the fourth element. An employee is similarly situated to a plaintiff if the two employees deal with the same supervisor, are subject to the same standards, and have engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them. *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 540 (7th Cir. 2007). Birkley fails to put forth sufficient evidence to show that she was treated differently than similarly situated employees.

For these reasons, on the record as a whole, no rational trier of fact could find that Target discriminated against Birkley based on race or sex. Summary judgment is granted in favor of Target on these claims.

*2. Title VII Retaliation*

Title VII also proscribes retaliation against an employee for opposing a practice otherwise made unlawful under Title VII. 42 U.S.C. § 2000e-3(a). Under Title VII, unlawful retaliation occurs when an employer takes actions that "discriminate against" an employee because she has opposed a practice that Title VII forbids. *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 939 (7th Cir. 2007). "'To prevail on a Title VII retaliation claim, the plaintiff must prove that (1) [she] engaged in an activity protected by the statute; (2) [she] suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action.'" *Giese v. City of Kankakee*, 71 F.4th 582, 590 (7th Cir. 2023) (quoting *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018)). For a retaliation claim, an adverse employment action is that which would "dissuade[ ] a reasonable worker from making or

supporting a charge of discrimination." *Id.* (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). The plaintiff must show that the employer took the adverse employment action because of the protected activity. *Id.*

Birkley asserts that she engaged in protected activity under Title VII when she "explicitly opposed a hostile work environment and reported her coworker's dangerous conduct and the supervisor's immediate bias." (Docket # 79 at 3.) It appears Birkley refers to a coaching she received on December 10, 2022, after a conflict with a co-worker in which the co-worker claimed Birkley rudely and obnoxiously honked her horn at him, and she asserts that she blew her horn to alert him that she was coming through. (Docket # 75-8 at 29.) While Target's records stated that Birkley's actions "created a hostile environment for both that team member and others in the department," (*id.*), there is no mention of race, sex, or other protected characteristic. And "[m]erely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient" to constitute a statutorily protected activity. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006).

Even assuming, however, that Birkley's complaints about the "horn incident" constitute a statutorily protected activity, Birkley's sole argument connecting the complaint with her termination is the "close timing . . . between her safety/bias complaint and her sudden termination." (Docket # 79 at 6.) While this incident occurred 10 days prior to Birkley's termination, "mere temporal proximity" between the protected activity and the action alleged to have been taken in retaliation for that activity "will rarely be sufficient in and of itself to create a triable issue." *Stone v. City of Indianapolis Pub. Utilities Div.*, 281 F.3d

640, 644 (7th Cir. 2002). Especially in this case where Target documented multiple incidents of employment issues with Birkley dating back to a year before the horn incident.

Target assumes, however, for purposes of summary judgment, that three incidents could possibly constitute protected activity, as Birkley did complain of discrimination based on a protected characteristic at those times. Specifically, during the August 14, 2022, meeting with Behnke, Birkley alleged discrimination based on sex and race. (Docket # 71 at 11.) In the September 5 and 6, 2022, emails Birkley sent to Behnke, she indicated that she had or was planning to file discrimination charges based on race, gender, and retaliation. (*Id.*) And in her November 25, 2022, Hotline complaint, she alleged disability discrimination. (*Id.*) But again, even assuming Birkley establishes the first two elements of her retaliation claim, there is no evidence demonstrating a causal connection between the actions and her termination. While the November 25 complaint occurred less than a month before her termination, the first two complaints occurred several months prior. And once again, temporal proximity, in and of itself, is rarely sufficient to prove causation. *See Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 919 (7th Cir. 2000) (finding that with no evidence other than a three-month gap between the protected activity and the employment action, "one could not reasonably conclude that the two events are causally related to one another"). The evidence shows that during Birkley's approximately 14-and-a-half month employment with Target, she was coached 46 times for problems with safety, teamwork, work quality, and reliability, and received three Corrective Actions. Birkley has put forth insufficient evidence in which a jury could find that her termination was causally connected to any alleged statutorily protected activity. For these reasons, summary judgment is granted in favor of Target on Birkley's retaliation claim.

## CONCLUSION

Birkley alleges that her former employer, Target, discriminated against her based on her sex and race and retaliated against her for opposing discrimination in the workplace. Looking at the record as a whole, however, no rational trier of fact could find that Target discriminated against Birkley based on her sex or race, or that Target retaliated against her for opposing discrimination in the workplace. For these reasons, summary judgment is granted in favor of Target. Birkley's complaint is dismissed.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the defendant's motion for summary judgment (Docket # 69) is **GRANTED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 19th day of November, 2026.

BY THE COURT:

Nancy Joseph

____________________________

NANCY JOSEPH
United States Magistrate Judge